# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

BETHESDA THOMPSON      *
                 *
        v.              *      Case No. SAG-10-CV-2665
                 *
COMMISSIONER, SOCIAL SECURITY      *
                 *

******

## MEMORANDUM OPINION

Bethesda Thompson (sometimes referred to as "Claimant" or "Ms. Thompson") brought this action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision by the Commissioner of the Social Security Administration ("Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. Pending, by their consent, are the parties' cross-motions for summary judgment. ECF Nos. 13, 17. No hearing is necessary. Loc. R. 105.6. For the reasons set forth below, both parties' motions for summary judgment are DENIED, the decision of the Commissioner is VACATED, and the case is REMANDED for further proceedings consistent with this Memorandum.

## I. BACKGROUND

Ms. Thompson applied for DIB on November 30, 2005, alleging that she has been disabled since October 31, 2005. Tr. 85-88. Ms. Thompson's claim was denied initially and upon reconsideration. Tr. 12. Ms. Thompson filed a timely request for a hearing and appeared, with representation, at a hearing before the Honorable Theodore Burock, Administrative Law Judge ("ALJ") on November 3, 2008. Tr. 291-320.

1

In a written decision dated February 4, 2009, the ALJ denied Ms. Thompson's claim, concluding that she had not been under a disability within the meaning of the Social Security Act at any time from November 30, 2005 through the date of the decision. Tr. 12. The Appeals Council denied Ms. Thompson's request for review on September 9, 2010, making the ALJ's decision the final, reviewable decision of the Commissioner. Tr. 3.

## II.  STANDARD OF REVIEW

The function of this Court is not to review Ms. Thompson's claim *de novo* or reweigh the evidence of record. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986). Rather, this Court is to determine whether, upon review of the whole record, the Commissioner's decision is supported by substantial evidence and a proper application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987); see 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla but less than a preponderance of the evidence presented. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1996). It is such relevant evidence as a reasonable mind might accept as adequate to support a verdict were the case before a jury. Johnson v. Califano, 434 F.Supp. 302, 307 (D.Md. 1977). Usually, if substantial evidence supports the Commissioner's decision, the decision must be upheld. Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972); see 42 U.S.C. § 405(g).

In addition to reviewing the ALJ's decision to determine whether it is supported by substantial evidence, this Court also must determine whether the ALJ properly applied the law. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard

or misapplication of the law." Coffman, 829 F.2d at 517. After reviewing the ALJ's decision, this Court may affirm, modify, or reverse the decision of the ALJ and may remand the case for a rehearing. Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991); Coffman, 829 F.2d at 519; Vietek v. Finch, 438 F.2d 1157, 1158 (4th Cir. 1971); see 42 U.S.C. § 405(g).

In determining whether a claimant is disabled within the meaning of DIB, the Commissioner has promulgated regulations that set forth a five-step sequential evaluation procedure. See 20 C.F.R. § 404.1520. This five-step process, described by the Supreme Court in Bowen v. Yuckert, 482 U.S. 137 (1987), begins with the ALJ determining whether the claimant is engaged in substantial gainful activity, which is defined for DIB claims in 20 C.F.R. §§ 404.1510, 404.1572. If the claimant is engaged in a substantial gainful activity, the claimant is not considered disabled. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ next examines the physical and/or mental impairments alleged by the claimant and determines whether these impairments meet the durational and severity requirements set forth in 20 C.F.R. §§ 404.1509 and 404.1520(c).

If the impairment or impairments meet the durational and severity requirements, the ALJ's analysis proceeds to a third step—a consideration of whether the impairment or impairments, either severally or in combination, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is known as the Listing of Impairments ("Listings"). Bowen, 482 U.S. at 141; Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001). If one of the Listings is met, disability will automatically be found without consideration of age, education, or work experience. If no Listing is met, however, the ALJ moves to a fourth step and considers whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. Bowen, 482 U.S. at 141; Mastro, 270 F.3d at 177. An individual's RFC "is the most [the

individual] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). If the ALJ finds that a claimant retains the RFC to perform past relevant work, the claimant will be found not to be disabled. Bowen, 482 U.S. at 141.

If a determination is made that the claimant is not capable of performing his or her "past relevant work," the ALJ moves to a fifth step and considers whether, based upon the claimant's RFC, age, education, and past work experience, the claimant is capable of some other work. Id. at 142; Mastro, 270 F.3d at 177. At this step the burden shifts to the Commissioner. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995). If the claimant suffers solely from exertional impairments,[1] the Medical–Vocational guidelines, as defined in Part 404, Subpart P, Appendix 2 ("Guidelines"), provide rules to be applied in determining whether a claimant is disabled. An ALJ, in applying the Guidelines, will examine the claimant's age, education, work experience, and RFC to determine which rule applies. 20 C.F.R. § 404.1520(d). The rule will direct a conclusion as to whether a claimant is disabled. Id.

The Guidelines, however, will not be used when the claimant suffers from both exertional and non-exertional impairments. 20 C.F.R. § 404.1569a(d). In such a case, the ALJ is required to employ the use of a vocational expert to determine whether the claimant is still capable of some work. 20 C.F.R. § 404.1560. If the claimant is not capable, disability will be found.

---

[1] Impairments may be exertional or non-exertional. An exertional limitation is one that affects the claimant's ability to meet the strength demands of certain jobs. 20 C.F.R. § 416.969a(b). A non-exertional impairment is a "limitation that is present whether the claimant is attempting to perform the physical requirements of the job or not." Gory v. Schweiker, 712 F.2d 929, 930 (4th Cir. 1983). "[W]here the claimant's impairment is nonexertional-not manifested by a loss of strength or other physical ability—or is marked by a combination of exertional and non-exertional impairments, the grids' Rules are not conclusive, and full individualized consideration must be given to all relevant facts of the case." Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983).

## III. ALJ'S DECISION

After reviewing all of the evidence, including the medical records and Ms. Thompson's testimony, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since November 30, 2005, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: chronic obstructive pulmonary disease ("COPD"), seizure disorder, hepatitis C, depression and lumbosacral and cervical disc disease (20 CFR 416.921 *et seq.*).

. . .

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).
 . . .

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant is limited to routine repetitive tasks. She is limited to only incidental public contact. The claimant cannot climbing [sic] ladders, ropes and scaffolds. She must avoid balancing and hazards, such as unprotected height and dangerous equipment. The claimant must avoid concentrated exposure to fumes, odors, dust, gas, and poor ventilation.
 . . .

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on March 9, 1955 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

. . .

    10. The claimant has not been under a disability, as defined in the Social Security Act, since November 30, 2005, the date the application was filed (20 CFR 416.920(g)).

Tr. 14-23.

## IV.    SUMMARY OF EVIDENCE

Ms. Thompson saw various medical professionals between 2005 and 2008 for her right hand nerve palsy, chronic obstructive pulmonary disease ("COPD"), Hepatitis C, depression, lumbosacral and cervical disc disease, and seizures. Tr. 136-281. Dr. Christine Baker has served as Ms. Thompson's treating physician since 2005. Tr. 138. On December 2, 2005, Dr. Baker completed a medical report indicating that Ms. Thompson was unable to work as she had "Saturday Night Palsy" in her right hand, leading to marked to moderate restrictions in her activities of daily living. Tr. 264-268.

On August 17, 2006, Ms. Thompson had a urine toxicology test result positive for cocaine. Tr. 252.

One week later, on August 24, 2006, Dr. Stephen A. Hirsch completed a psychiatric evaluation of Ms. Thompson. Tr. 270. Ms. Thompson told Dr. Hirsch that she had walked to the appointment from her home, which took her 50 minutes to one hour. Tr. 270, 272. She told him that she did not know that she was at the appointment because of her Social Security claim. Tr. 270. She told Dr. Hirsch that she was not under any form of medical care, did not take medicines, had never been in a hospital or had mental health treatment, and had never smoked cigarettes or used alcohol or drugs. Tr. 270-71. She told Dr. Hirsch that she was unsure whether her mother lived in the apartment or was living or dead. Tr. 271. She told him that she has a driver's license and drives, but that she walked to the appointment. Tr. 271. She told him she last did work cleaning up at Popeye's restaurants for 3 or 4 years, but left because she got tired.

6

Tr. 271.  Dr. Hirsch reported, "She is not retarded.  She seems to be, perhaps, very pressured and maybe overwhelmed by some things underlying . . . One does not feel that she is actively exaggerating or minimizing symptoms, perhaps much more clearly just simply displaying them."  Tr. 272.  He further opined:

> It certainly does not appear that Ms. Bethesda Thompson is going to put in a day's work, or see a job through to an end point . . .She does have some abilities and some skills and some capabilities, but certainly seems, under present circumstances, to be certainly overwhelmed by symptoms and some significant amount of isolation . . . under these acute circumstances, one would certainly recommend if monies were merited and awarded, they come in her name through some appropriate guardian who might guide her to some appropriate treatment resources.

Tr.  274-75.

On August 28, 2006, Dr. Darjeet Saluja, M.D. physically examined Ms. Thompson.  Tr. 231.  Dr. Saluja diagnosed "h/o neuropathy of (rt) hand," "low back pain . . . seizure d/o".  Tr. 231.  He determined that, "Pt is able to understand/comprehend.  Sit- 2-3 hours, stand – 45 min, walk – 1 block, lift/carry – 5-10 lbs."  Tr. 231.

On October 31, 2006, a "Mental Residual Functional Capacity Assessment" was filed by Dr. Diana Walcutt, PhD, who reviewed the file and did not examine Ms. Thompson.  Based largely upon Ms. Thompson's substance abuse history and the psychiatric exam by Dr. Hirsch, Dr. Walcutt found that Ms. Thompson was moderately limited in several capacities, particularly as to "sustained concentration and persistence" and "social interaction."  Tr. 203-04.  Dr. Walcutt determined that, "the claimant retains the capacity to perform work-related tasks from a mental health perspective."  Tr. 205.  Dr. Walcutt made no findings as to Ms. Thompson's mental retardation or IQ.  Tr. 207, 211.

On November 21, 2006, a "Physical Residual Functional Capacity Assessment" was filed by Harriet C. Koppelman, M.D., who reviewed the file and did not examine Ms. Thompson.  Dr.

Koppelman found that Ms. Thompson had few exertional limitations and her only postural limitations were climbing ladders/ropes/scaffolds and balancing, which she could "never" do. Tr. 195-196. Dr. Koppelman found that other than avoiding exposure to hazards such as machinery and heights, there were no environmental limitations. Tr. 198. In her assessment, Dr. Koppelman relied repeatedly on the fact that Ms. Thompson had walked a long distance to get to her appointment with Dr. Hirsch. Tr. 195-199. Dr. Koppelman also stated, "At Internist CE, Dr. Saluja reports that she can sit 2-3 hrs, stand 45 min & walk 1 block & carry 5-10 lbs. This is not supported by MER." Tr. 200. Dr. Koppelman provided no additional explanation as to why she felt Dr. Saluja's conclusions were "not supported by MER."

On September 29, 2008, Dr. Baker, Ms. Thompson's treating physician, submitted another Medical Assessment Report. Tr. 138-141. Dr. Baker opined that Ms. Thompson was unable to stand for six out of eight hours and unable to lift even ten pounds. Tr. 139. Dr. Baker cited the fact that Ms. Thompson's sciatica is increased by standing, and that she has right arm pain and weakness. Tr. 139. In addition, Dr. Baker stated that Ms. Thompson has approximately two seizures per month, and opined that Ms. Thompson can be expected to miss at least 30 days of work per year for medical reasons due to her various severe impairments. Tr. 140.

On October 13, 2008, Ms. Thompson was evaluated by Dr. Edward Leslie Ansel, PhD., a licensed psychologist. Dr. Ansel's report indicated that Ms. Thompson "was oriented, alert, and neatly groomed and dressed. Her affect was appropriate and her mood was euthymic." Tr. 184. Dr. Ansel also noted that, "Ms. Thompson was cooperative throughout the various testing procedures. The obtained results are assumed to have yielded an accurate estimate of her current level of functioning." Tr. 184. He stated that, "[h]er lowest performance occurred in a test of verbal reasoning ability, indicating a limited knowledge of social norms and institutions." Tr.

185. Finally, Dr. Ansel opined, "Ms. Thompson's current overall level of intellectual functioning is in the Mildly Mentally Retarded range. In the opinion of this examiner, this has been the case since the developmental period . . . Due to this combination of circumstances, she does not appear to be capable of participating in substantial gainful employment." Tr. 185-86.

At the hearing held on November 3, 2008 before ALJ Burock, Ms. Thompson testified that she had had a seizure on the Wednesday before the hearing. Tr. 301. She testified that she has the seizures "about once a week." Tr. 302. She testified that she has constant pain in her neck and low back, and that it gets worse if she is "walking or standing up." Tr. 304. She testified that she believes she is depressed because she doesn't want to get together with people or do anything, and she only sleeps about an hour and a half at night. Tr. 307-308.

At the hearing, the ALJ also heard testimony from Owen Dodd, a Vocational Expert. Tr. 315. The ALJ asked Mr. Dodd a hypothetical involving "an individual who is closely approaching advanced age, literate, and with no past work . . . who has a residual functional capacity for medium work, and non-exertionally limited to routine repetitive tasks involving only incidental public contact." Tr. 316. Mr. Dodd opined that the hypothetical person could hold jobs such as a dishwasher, laundry worker, or janitor. Tr. 316-17. The ALJ asked a second hypothetical limiting the residual function capacity to light work but keeping the other restrictions the same. Tr. 317. Mr. Dodd opined that jobs for that hypothetical worker would include packager, laundry folder, or motel maid. Tr. 317. The ALJ then stipulated, without asking Mr. Dodd, that if Ms. Thompson's residual functional capacity were limited to sedentary work, or if she would miss more than thirty days per year of work, then "there would be either no work, or she would be a grid rule allowance." Tr. 318. Although the ALJ did determine with Mr. Dodd that a person with low grade equivalents for reading, comprehension, spelling and

math would have the same work options as a literate person, Mr. Dodd was not asked any hypotheticals involving mental retardation, low IQ, depression or even the moderate limitations in understanding and memory or concentration that were found by the doctor that the ALJ eventually credited, Dr. Diana Walcutt. Tr. 203-204.

## V. ANALYSIS

There were at least two separate issues with the ALJ's analysis of Ms. Thompson's claim. First, the ALJ wrongly rejected the IQ scores obtained by Dr. Ansel without citing substantial evidence supporting a lack of mental retardation. Second, the ALJ made insufficient findings to justify his affording no weight to Ms. Thompson's treating physician and great weight to two non-examining, non-treating physicians, where the opinions of those two physicians were contradicted by other evidence of record.[2]

### 1. Step Two: Evaluation of Ms. Thompson's IQ

At step two of the sequential evaluation, the adjudicator must make a finding as to severity of the alleged impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Under the governing regulations, mental retardation is a severe impairment if a claimant has

> a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Part 404, Subpt. P, App. 1, Listing 12.05C.

Dr. Edward Ansel, the Office of Hearings and Appeals's own medical expert, expressly

---

[2] Ms. Thompson also makes a series of other arguments, including a contention that the hypotheticals posed to the vocational expert were insufficient because they did not include her mental limitations. Because I have determined that the ALJ's application of the five-step process was deficient at earlier steps in the sequence, I need not reach those other issues.

determined that Ms. Thompson has been mentally retarded since the developmental period. Tr. 185. He also determined that her mental impairment, combined with her other severe physical impairments (which alone, in the view of Ms. Thompson's treating physician, caused her to be incapable of work), rendered her incapable of performing SGA. Id.

Despite this evidence, the ALJ failed to make a finding as to whether this alleged impairment was severe; he did not determine whether Claimant's mild mental retardation severely limited her ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii); 404.1521(a)-(b). He also did not determine whether Ms. Thompson's mild mental retardation, in combination with her other mental impairments, rendered her incapable of performing SGA. *See* 20 CFR § 404.1520a(b)-(e) (describing the special technique that ALJs must use to evaluate a claimant's mental impairments). Instead, he rejected the validity of the IQ testing because (1) Ms. Thompson had attended regular classes, not learning disabled classes, until quitting school in the seventh grade, (2) she was able to complete the adult function report, and (3) Ms. Thompson attempted to present herself as more intellectually limited than she is and that she did not put forth full effort when being tested. Tr. 22.

The Fourth Circuit has not decided whether an IQ test score can be disregarded in the absence of another IQ test score in the record. Nonetheless, at least six other circuits have held that an IQ test score can be disregarded as proof of mental retardation even without evidence of another IQ test in the record. See Lax v. Astrue, 489 F.3d 1080 (10th Cir. 2007) (affirming ALJ decision that applicant's IQ scores were not an accurate measurement of his functioning rather than remanding for new sets of IQ tests); Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003) (noting an ALJ can reject IQ scores that are inconsistent with the record but holding that in that case the record did not support the ALJ's decision); Clark v. Apfel, 141 F.3d 1253, 1255 (8th

Cir. 1998) ("Commissioner is not required to accept a applicant's I.Q. scores, however, and may reject scores that are inconsistent with the record."); Muse v. Sullivan, 925 F.2d 785 (5th Cir. 1991) (finding there was substantial evidence, including one physician's report finding no mental retardation, that supported the ALJ's finding of no retardation despite two other physicians' reports with IQ scores indicating retardation). See also Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986) (holding that test results should be examined to assure consistency with daily activities and behavior); Strunk v. Heckler, 732 F.2d 1357, 1360 (7th Cir. 1984) ("The plaintiff has failed to supply this court, nor have we found any case law requiring the Secretary to make a finding of mental retardation based *solely* upon the results of a standardized intelligence test").

With that said, the ALJ could not simply disregard Ms. Thompson's IQ scores without relying on substantial evidence supporting the lack of mental retardation. McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983) ("Objective medical tests and doctor's opinions are a major part of the proof to be considered in disability cases that an ALJ must take into consideration"). The Fourth Circuit has reversed an ALJ's decision on mental retardation where the ALJ cited insufficient evidence for considering IQ scores to be invalid. Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983) (reversing ALJ's decision because the ALJ did not cite substantial evidence to disregard significant evidence indicating that the claimant was mentally retarded, including a treating doctor's evaluation that the applicant's IQ was about 58). Similarly, this circuit has reversed cases upon finding an ALJ failed to develop the record as to whether a claimant had mental retardation. See e.g., Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986) (reversing because the ALJ did not fulfill the duty to develop the record on the issue of mental retardation, with the Court noting that standardized testing was one way in which that duty could have been met).

In Ms. Thompson's case, the ALJ cited insufficient evidence to support his position that the IQ scores were invalid. First, the fact that Ms. Thompson reported that she attended regular classes instead of special education classes is not significant, given the fact that the ALJ found that she left school during the seventh grade. Her school records were not available, Tr. 91, and no information therefore could be gleaned about her grades or whether she was properly evaluated during her school years. Second, although Ms. Thompson completed and submitted an adult function report, there is no evidence in the record about whether she completed that report on her own. Moreover, the language and grammar in that report support the notion that Ms. Thompson has significant limitations, and cannot reasonably be viewed as substantial evidence of a lack of mental impairment. Tr. 101-108. Finally, the ALJ contends that Ms. Thompson "attempted to present herself as extremely limited" during her examination with Dr. Hirsch, Tr. 22, and therefore expresses doubt that she put forth full effort in her psychometric testing with Dr. Ansel. However, contrary to the ALJ's conclusion that Ms. Thompson was intentionally attempting to appear limited in her meetings with the physicians, both Dr. Hirsch and Dr. Ansel reported confidence that Ms. Thompson was cooperating fully with their examinations.[3] Tr. 272, 184. Moreover, Dr. Ansel's examination occurred more than two years after Ms. Thompson's examination by Dr. Hirsch, and it simply cannot be said that a perceived attempt at malingering with Dr. Hirsch would be relevant to assessing the validity of IQ testing two years later in the absence of any like issues at the appointment with Dr. Ansel. Finally, Dr. Ansel is not an expert hired by Ms. Thompson's attorney, but an expert arranged by the Office of Disability Adjudication and Review. Tr. 289.

---

[3] The Court further notes that Ms. Thompson tested positive for cocaine approximately one week before her appointment with Dr. Hirsch. No such finding coincided with her appointment with Dr. Ansel.

In the absence of any other IQ testing for Ms. Thompson, and the fact that both Dr. Hirsch and Dr. Ansel reached the conclusion that Ms. Thompson's mental limitations would preclude her from work, the ALJ failed to make appropriate findings about the severity of her mental limitations and the effect that any such limitations would have in combination with her other severe impairments. This case will be remanded for such findings.

2. **Step Four: Assigning weight to the opinions of Ms. Thompson's doctors**

Ms. Thompson contends that the ALJ did not properly adjudicate the medical opinion of her treating physician, Dr. Christine Baker. Dr. Baker's 2008 opinion, if accepted, would limit Ms. Thompson to the sedentary work level, and the ALJ concedes that if Ms. Thompson is limited to the sedentary work level, she must be found disabled pursuant to Grid Rule 201.09. Tr. 318. In addition, if the ALJ credited Dr. Baker's opinion that Ms. Thompson can be expected to miss at least 30 days of work per year for medical reasons, there would be no work available for her. Tr. 318.

There is no dispute that Dr. Baker was Ms. Thompson's treating physician. The ALJ is generally required to accord greater weight to the opinion of a treating physician. 20 C.F.R. § 404.1527(d)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). This is because "these sources are likely to be ... most able to provide a detailed, longitudinal picture of a claimant's medical impairments." 20 C.F.R. § 404.1527(d) (2). If a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." Id.; Mastro, 270 F.3d at 178.

While the treating physician rule generally requires a court to accord greater weight to the opinion of a treating physician, it does not require that the opinion be given controlling weight.

Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (*per curiam*). Rather, per the regulations, a treating physician's opinion as to the nature and severity of the claimed impairment is entitled to controlling weight only if it is well-supported and it is not inconsistent with the other substantial evidence in the record. Mastro, 270 F.3d at 178; 20 C.F.R. § 404.1527(d)(2). "By negative implication, if a physician's opinion is not supported by clinical evidence, or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, the ALJ holds the discretion to give less weight to the opinion of a treating physician in the face of persuasive contrary evidence. Mastro, 270 F.3d at 178; see also Craig, 76 F.3d at 590 (upholding ALJ's rejection of treating physician's opinion because the record contained persuasive contradictory evidence and treating physician's own notes contradicted his opinion).

Conversely, evidence from a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence of record. Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). The testimony of such a non-examining physician can be relied upon where it is consistent with the record or where examining and treating physicians are split as to their opinions. Id.

In Ms. Thompson's case, the ALJ gave no weight to Dr. Baker's opinion because he determined "it is inconsistent [with] the record as a whole." Tr. 21. However, the ALJ provides no analysis as to how Dr. Baker's opinion is inconsistent with the record as a whole.[4] In fact,

---

[4] Although analysis of this issue does not involve assessing the ALJ's findings of fact, it appears that some of those findings were not supported by substantial evidence. For example, the ALJ cites the fact that "on September 15, 2008, an evaluation form from JAI Medical [Dr. Baker] indicated no past history of seizures." Tr. 19. While it is true that on that one form, the "no" box is checked for "Past History/Seizures," the check was clearly made in error, as Dr. Baker's own notes from 12/21/2007 and 9/27/07, at least, contain references to "sz," which is an abbreviation for seizures. Tr. 144-45. Finally, the ALJ similarly states that Ms. Thompson indicated on her

there were three other physicians, in addition to Dr. Baker, who reached the conclusion after an evaluation of Ms. Thompson that she was unable to work. Tr. 231 (Dr. Saluja) ("Pt. is able to . . . sit – 2-3 hours stand – 45 min walk – 1block lift/carry 5-10 lbs"); Tr. 185-86 (Dr. Ansel) ("Due to this combination of circumstances, she does not appear to be capable of participating in substantial gainful employment."); Tr. 274 (Dr. Hirsch) ("It certainly does not appear that Ms. Bethesda Thompson is going to put in a day's work, or see a job through to an end point."). In conformance with his assessment of Dr. Baker, the ALJ found that Dr. Saluja's opinion and Dr. Ansel's opinion were both "inconsistent with the record as a whole," Tr. 21. The ALJ simply did not address whether he assigned any weight to Dr. Hirsch's opinion that Ms. Thompson is not going to "put in a day's work, or see a job through to an end point." Tr. 274. In fact, Dr. Hirsch even expressed reservation that Ms. Thompson would even be capable of handling her own funds if benefits were awarded. Tr. 274. Again, the ALJ quoted extensively from Dr. Hirsch's report, but did not address Dr. Hirsch's ultimate conclusions about Ms. Thompson's fitness for employment.

The ALJ instead gave "great weight" to the opinions of the only two non-treating, non-evaluating physicians: Dr. Diana Walcutt, PhD, and Dr. Harriet C. Koppelman, MD. Without further explanation, the ALJ deemed those two doctors' opinions to be "consistent with the record as a whole." Tr. 21. Given the fact that four out of the six doctors who rendered opinions opined that Ms. Thompson was incapable of gainful employment, and all four of those doctors actually performed an in-person evaluation or engaged in regular treatment of Ms. Thompson, it is difficult to see how it can be said that any one opinion could be accepted or rejected based on

---

adult function report that she drives a car, when "it is noted that on the same page of the adult function report she alleged she does not drive because she does not know how." Tr. 19. The adult function report, Tr. 104, clearly shows that the box next to "drive a car" was almost checked, but the marking was crossed out, and "ride in a car" was checked instead.

16

consistency or inconsistency with the record as a whole. This is not a case in which there is a single opinion that is an outlier. As a result, the ALJ's decision to credit only the non-treating, non-evaluating physicians and to reject the treating and evaluating physicians runs contrary to the dictates of Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Consequently, the ALJ did not properly apply the law, see Coffman, 829 F.2d at 517, and this case must be remanded for the law to be applied properly, in accordance with this Memorandum.

## VI. CONCLUSION

In sum, there is evidence in this case that leads to the conclusion that Claimant had an IQ and mild mental retardation that may have been a severe impairment, but this evidence was not considered. This error at step two inevitably infects the analysis at the subsequent steps, including steps four and five. See Brown v. Barnhart, 182 Fed. App'x 771, 774 (10th Cir.2006) (ALJ's failure to properly consider fibromyalgia at step two impaired analysis at subsequent steps). In addition, the ALJ did not properly assign weight to the opinions of the various physicians in the record. The Court therefore finds that the ALJ failed to evaluate adequately the relevant evidence in the record that may have had a bearing on the determination of Claimant's entitlement to disability benefits.

Accordingly, I am denying both parties' motions for summary judgment and remanding this case to the Agency for further consideration. A separate order shall issue.

Dated: July 13, 2011                                               /s/
                                                                                Stephanie A. Gallagher
                                                                                United States Magistrate Judge